# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

KIMBERLY WASHINGTON,

*Plaintiff*,

v.

OFFENDER AID AND RESTORATION OF
CHARLOTTESVILLE-ALBEMARLE,
INC.,

*Defendant.*

CASE NO. 3:22-cv-00041

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Kimberly Washington, an African American, raises several claims against her employer, Offender Aid and Restoration of Charlottesville-Albemarle, Inc. ("OAR"), stemming from her receiving three anonymous racist letters. OAR moves for summary judgment on all her claims. For the following reasons, the Court will grant OAR's motion.

## **Background**

OAR is private nonprofit organization located in Charlottesville, Virginia that provides pretrial investigation, pretrial supervision, community correction, and reentry services to persons located in central Virginia. Dkt. 16 ¶ 7. In May 2006, OAR hired Washington as a probation officer. Dkt. 23-1 at 11. She was later transferred from the probation team to the pretrial team, and after submitting an application, she was promoted to a senior pretrial officer. *Id.* at 15–16.

During a staff meeting in late June 2020, Washington complained that OAR has never promoted a Black woman to a paid leadership position during the time she has worked there.

Dkt. 30 at 25.[1] On July 1, 2020, Washington received the first anonymous racist letter in her mailbox at the OAR office. Dkt. 23-2 ¶ 8. The handwritten letter stated "Kim – N**** girl shut the f*** up during meetings Lives don't matter!" Dkt. 23-8.

Shortly after receiving this letter, Washington called the OAR Executive Director, Ross Carew, to tell him about the letter. Dkt. 23-1 at 33. Carew sounded shocked and in disbelief about the letter. *Id.* He told Washington he would contact the OAR Assistant Director, Susan Morrow, and after speaking with Marrow, he told Washington that Morrow would be at the office shortly. *Id.* at 34. After Morrow arrived and spoke with Washington, Morrow decided to call the Charlottesville police. Dkt. 23-1 at 35; Dkt. 23-2 ¶ 8. Charlottesville police officers arrived at the OAR office and conducted an investigation. Dkt. 23-1 at 36–37; Dkt. 23-2 ¶ 8. On that same day, Carew contacted the Charlottesville Commonwealth's Attorney's office to inform it that Washington had discovered an anonymous racist letter and "that OAR considered this letter to be a hate crime." Dkt. 23-1 at 41; Dkt. 23-2 ¶ 9.

On July 7, 2020, Carew told OAR's staff about the first letter. Dkt. 23-2 ¶ 16. On July 9, 2020, OAR retained a labor and employment attorney at Woods Rogers PLC to conduct a third-party investigation of the letter. *Id.* ¶ 17.

On July 13, 2020, Washington received a second anonymous racist letter at her apartment located in Louisa County. *Id.* ¶ 18. The letter was handwritten on OAR letterhead and sent in an OAR envelope. Dkt. 30-8. It stated, "Kim - n**** bitch you will be the next one with a noose around your neck" if "you keep talking!" *Id.* On July 15, 2020, Carew contacted Louisa County Sheriff's Department to inform it about the second letter. Dkt. 23-2 ¶ 20.

---

[1] Washington asserts this claim in her opposition brief without citing to the record. But because OAR does not dispute this occurring in its reply brief, the Court assumes this fact to be undisputed.

On July 14, 2020, Washington started working from home. Dkt. 23-1 at 26–27. Once she started working remotely, she was unable to complete some of her job duties, such as going to the jail or completing a bond report. *Id.* at 27–28. For more than a year, her co-workers performed these tasks for her while she worked remotely. *Id.* at 28–29.

The FBI began investigating the letters in mid-July 2020. *Id.* at 41. On July 21, 2020, an FBI agent told Carew that the FBI would prefer for OAR to pause any third-party investigation of the letters during its official investigation. Dkt. 23-2 ¶ 21. On July 23, 2020, Carew informed Washington that OAR had retained an attorney to investigate the anonymous letters. Dkt. 23-2 at 19. Washington responded that she "should not be speaking to anyone about the case," per the FBI's advice, and that she was not sure how it was "going to work with the FBI and the Investigator." *Id.* at 18. Carew replied that the investigator would not be contacting Washington at this time, per the FBI's request. *Id.*

In August 2020, Washington while working at home purportedly received a ten-second phone call from an OAR phone number. Dkt. 32-3 at 19–21. Nobody said anything on the call. *Id.* at 19. Washington complained about this call to OAR. *Id.* at 20. In response, Carew emailed Washington to let her know that he had downloaded the OAR call log over the past 30 days and sent that information to an FBI agent. Dkt. 32-9 at 2. In that email, he explained that the call log did not show any call from an OAR phone number to her phone number at the time she claims to have received the call. *Id.* (Carew's email to Washington stating, "according to this [call log,] no call was made to your phone from OAR at that time. I was able to see the record of the call back that you made at 3:11 but there was nothing right prior to that.").

In August 2020, Washington asked OAR for two weeks of paid leave. Dkt. 23-2 at 21. Under its policy handbook, OAR does not provide paid administrative leave. *Id.* However, "due

to the unprecedented and unanticipated events," Carew went to the OAR Board Chair and advocated for an exception to the paid administrative leave policy, which OAR granted. *Id.* In a memorandum sent to Washington granting her paid leave request, Carew explained that "it is clear that the ongoing effects from the recent incidents are making it difficult for you to meet the daily obligations for work" and that OAR "hope[s] that this time enables you to relax and repair as much as possible." *Id.*

In early September 2020, Carew emailed the OAR staff to provide an update on the FBI investigation. Dkt. 30-12 at 2. He explained that the "FBI are continuing to investigate and [have] no new information to report" and that "[t]here is current action taking place behind the scenes." *Id.* He also reminded the team that:

> This is currently a criminal investigation with evidence to process
> As such, information is not shared as to not jeopardize the investigation
> We cannot control the timeline or influence the direction
> We (OAR) have provided the FBI everything requested and more[.]

*Id.*

On October 13, 2020, a third anonymous racist letter was placed on the windshield of Washington's vehicle, which was parked near her apartment. Dkt. 23-1 at 3–4. The letter was handwritten on OAR letterhead and placed inside an OAR envelope. Dkt. 30-9 at 1–3. It stated: "Kim - you are not missed. Ross said you are just like Mayor Walker. 2 N***** Bitches. We hate blacks Saving stamps." *Id.* at 3.

In November 2021, Washington's therapist, Tabitha Woodson, LCP, explained in a letter to OAR that Washington has post-traumatic stress disorder ("PTSD") and that she has been participating in weekly outpatient sessions "with the goal of reducing her physical and emotion symptoms." Dkt. 30-11 at 98. She continued in the letter by stating:

Clinically, [] Washington will need to focus more on leaving her home, traveling to the

office, going inside the office, and getting prepared for her work day . . . . Her office based working hours should be gradually increased based upon her ability to effectively manage her symptoms . . . . Washington will also require a significant amount of support from her supervisors. This is very important with helping [] Washington move towards feeling safe and supported in her work environment again.

*Id.*

In 2021, Washington asked OAR to hire a security guard. Dkt. 23-1 at 23–24; Dkt. 23-2 ¶ 15. OAR did not hire the security guard because it claims it lacked the financial resources to do so. Dkt. 23-2 ¶ 15. It also claims that having a personally security guard for Washington "would have made it impossible for her to perform her job duties" since "trust and confidentially are critical to a pretrial officer's ability to perform" her duties. *Id.*[2]

In March 2021, Washington's therapist, Woodson, sent a letter to OAR explaining that Washington has been receiving weekly outpatient therapy since February 2021 and that she "would benefit from having one mental health day per week for a period of two months" because she "continues to have mental exhaustion." Dkt. 30-11 at 103. In May 2021, Washington's primary care physician, Matthew J. Goodman, MD, sent two letters to OAR recommending that Washington work four days per week because "she has experienced issues with her mental and physical health" and suffers from sleep deprivation. Dkts. 30-11 at 24–25. OAR agreed with the medical providers' requests and permitted Washington to work four days per week from May 2021 until July 2022.[3] Dkt. 23-2 ¶ 28. OAR also allowed Washington to use her then-accrued

_____

[2] OAR has not employed any security guards since July 2020. Dkt. 30-6 ¶ 15. Washington contends that OAR "contracted for a part-time security guard whose employment ended in February 2022." Dkt. 30 at 4. However, the record shows that OAR contracted with the Albemarle County Sheriff's Department for a Drug Court Law Enforcement Officer for the Charlottesville Albemarle Drug Court program. *Id.* This officer worked in this role for approximately 20 hour per week from July 2020 to February 2022. *Id.* The officer did not work as a part-time security guard, as claimed by Washington.

[3] Washington's position as a senior pretrial officer position is a five-day-per-week job. Dkt. 23-2 ¶ 27.

paid time off on Fridays beginning in May 2021 until all her paid time off was exhausted in July 2022. *Id.*

In June 2021, Washington's primary care physician, Dr. Goodman, sent another letter to OAR explaining that Washington has experienced trauma from the anonymous racist letters. Dkt. 30-11 at 84. He recommended that OAR should implement a safety plan for when Washington returns to work at the office and that "[w]hen [she] does return to work, she should be eased back into the work schedule, to ensure that she can process any traumatizing effect of returning to a work environment where she was threatened." *Id.*

In that same month, Carew emailed Washington to ask for her proposed work schedule and work environment. Dkt. 30-11 at 26. He stated that "[d]ue to the relaxing of COVID restrictions," the "work environment, job duties and requirements, and state and court expectations are changing back to pre-COVID standards." *Id.* Therefore, he explained "[c]ore pretrial officer responsibilities such as face to face client contact, drug screening, jail interviews, and court appearances will be required." *Id.* In her response, Washington asked to work only remote "due to [the] nature of circumstances." *Id.* at 27.

OAR has not permitted Washington to work fully remote but has permitted her to work partially remote. On Mondays, Tuesdays, Thursdays, and Fridays, she works in the office from 7:30am to 12:30pm and then remote after 12:30pm. Dkt. 32-3 at 3; *see also* Dkt. 23-2 ¶ 30. On Wednesdays, she works in the office from 7:30am to 9:15am, attends her therapy session, and then works the rest of the day from home. Dkt. 32-3 at 3. This has been Washington's work schedule since around July 2022. *Id.*

Washington also requested additional security cameras at the OAR office. Prior to Washington receiving the first anonymous letter, OAR had four surveillance cameras outside of

its office to provide a view of the parking lot and two cameras in the lobby area of its office. Dkt. 23-2 ¶ 12; Dkt. 23-1 at 22. In September 2021, OAR installed two additional security cameras inside its office. Dkt. 23-2 ¶ 14. One camera captures the halls outside of Washington's office while the other was placed near the internal mailboxes. *Id.* In that same month, OAR also moved Washington's internal mailbox into her supervisor's office to limit general access to it. Dkt. 30-6 at 3. The installation of the cameras and the moving of her mailbox occurred prior to Washington's expected return to in-person work. *Id.*; Dkt. 23-2 ¶ 14.

In May 2022, Washington complained to OAR about finding a cracked mug placed on her desk. Dkt. 30-5. An OAR employee had placed the mug on her desk for an event hosted by the diversity, equity, and inclusion committee. *Id.*; Dkt. 30-19 at 19. Following her complaint, the OAR staff spent a couple hours reviewing camera footage from when the mug was placed in her office until she arrived at her office. Dkt. 30-5 at 1. In an email, the OAR staff informed Washington they had investigated the matter by reviewing camera footage and speaking to the employee who placed the mug in Washington's office. *Id.* The employee shared that "several of the mugs were broken during shipping" but that she checked the mugs before handing them out. *Id.* She, however, could not "confirm that the mug was not cracked when she placed it in [Washington's] office." *Id.* The OAR staff also provided Washington a detailed sequence of events based on their review of the camera footage and concluded that it did not "appear that anything suspicious/targeted/intentional occurred to crack the mug that was left in [her] office." *Id.* During her deposition taken in January 2023, Washington explained she found it "suspicious" that she was "the only one with a broken mug out of the whole office." Dkt. 32-1 at 18.

In March 2022, Washington's primary care physician, Dr. Goodman, sent a letter to OAR stating that Washington working more at the office had triggered her PTSD. Dkt. 30-11 at 99. He

continued by explaining that "she should continue to work toward spending time in the office," but "it should be done in a controlled fashion to allow her to adjust." *Id.*

In May 2022, Washington's therapist, Woodson, sent a letter to OAR explaining that "Washington would benefit from flexibility in her office based working hours" and "[t]here could be some stress associated physiological responses that could preclude [] Washington from working on site." Dkt. 30-11 at 71. In that same month, Washington's primary care physician, Dr. Goodman, sent a letter to OAR explaining that Washington has PTSD, reactive depressive, and genialized anxiety, and that "[h]er disability is likely to persist until the individual who threatened her is found and removed from the office and/or there is adequate security in her work place [sic]." *Id.* at 72.

In June 2022, OAR placed Washington on a performance improvement plan for failing to complete tasks required by her job duties. Dkt. 23-1 at 20; Dkt. 23-2 ¶ 35. Washington was assigned tasks while on the plan, and once she completed those tasks, she was taken off the performance improvement plan. Dkt. 23-1 at 20–21; Dkt. 23-2 ¶ 36.

On June 23, 2022, OAR placed a written warning in Washington's personnel file for not going to the jail to provide pretrial investigative services. Dkt. 32-6 at 2. The next day, an OAR employee emailed Washington stating:

> [I]t is now unclear as to whether you are refusing to conduct jail interviews or that you are unwilling to conduct jail interviews because it may lead to being in the OAR office alone. Please clarify. If it is the latter, then the written warning will be rescinded due to the misinterpretation.

Dkt. 30-22 at 1. Washington responded that she "refused to conduct jail interviews because [she was] unwilling to be in the OAR building alone." *Id.*

In her January 2023 deposition, Washington confirmed she has received raises and bonuses and that her pay has not been reduced in any way since receiving the first anonymous

letter. Dkt. 23-1 at 19; *see* Dkt. 23-2 ¶¶ 32, 33. She also has not been suspended or demoted since receiving the first letter. Dkt. 23-2 ¶ 34.

Neither the FBI nor OAR have been able to determine who sent the three anonymous letters. Dkt. 23-1 at 41, 48; Dkt. 23-2 ¶¶ 38–39. In late April and early May 2023, Carew emailed the FBI several times to ask about the status of its investigation. Dkt. 32-11 at 2–4. The FBI responded that it had closed its case in May 2023. *Id.* at 2. Since receiving the third anonymous letter in October 2020, Washington has not received any other racist letters.

Washington raises eleven claims against OAR. She alleges race, color, and sex discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act ("VHRA"). She also asserts disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA") and the VHRA. She further asserts unlawful retaliation under Virginia's Fraud and Abuse Whistle Blower Protection Act.

## **Standard of Review**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The

non-movant may not rest on allegations in the pleadings; rather, she must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

## Discussion

### A. Hostile Work Environment Claims

Washington argues that OAR created a hostile work environment based on race, color, and sex in violation of Title VII and the VHRA.[4] To survive summary judgment on these claims, Washington must show "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [race, color, or gender]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016).

The parties dispute whether Washington has shown that a reasonable jury could find that the anonymous racist letters are imputable to OAR—element four.[5] Under this element, an

---

[4] Title VII prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Similarly, VHRA prohibits employers from discriminating against individuals based on "race, color, religion, sex, . . ., disability, or national origin." Va. Code Ann. § 2.2-3905(B)(1). Because Title VII and the VHRA use substantially identical language, the Court analyzes Washington's Title VII and VHRA claims together. *See, e.g.*, *Rose-Stanley v. Virginia*, No. 2:15-cv-7, 2015 WL 6756910, at *4 (W.D. Va. Nov. 5, 2015) (noting that because the plaintiff "has not stated any viable claim under federal law, she cannot claim an unlawful discriminatory practice under the VHRA").

[5] The parties also dispute the third element of Washington's hostile work environment claims. For the reasons provided above, however, the Court need not address the third element.

employer may be liable for a hostile work environment created by anonymous third parties "if it knew or should have known about the harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (internal quotation marks omitted) (cleaned up).[6]

An employer's action being "reasonably calculated to end the harassment" depends, in part, on the seriousness of the underlying harassment. *Id.* The Fourth Circuit has not provided an "exhaustive list" or "particular combination" of remedial steps that an employer must take to avoid liability. *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (internal quotation marks omitted). Generally, though, courts have considered, among other things, "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* The mere fact harassment reoccurs in the workplace after an employer's response is not dispositive. *Id.*; *Pryor*, 791 F.3d at 498. However, "[a] remedial action that effectively stops the harassment will be deemed adequate as a matter of law." *Xerxes Corp.*, 639 F.3d at 670. While plaintiffs "often feel that their employer could have done more to remedy the adverse effects of the employee's conduct," "Title VII requires only that the employer take steps reasonably likely to stop the harassment." *Id.* at 674 (internal quotation marks omitted).

Here, Washington relies on *Pryor* to support her argument that a reasonable jury could find OAR liable for the anonymous racist letters. In *Pryor*, an African American employee

---

[6] OAR argues that the Court should only consider the first anonymous letter discovered at its office and not the letters discovered near Washington's apartment. The Court disagrees and believes that the second and third letters being written on OAR letterhead and placed in an OAR envelope raise a dispute of fact on whether those letters amount to workplace harassment. However, for the reasons provided above, this factual dispute is not material because OAR's response to all the letters was reasonably calculated to end the harassment.

"discovered in her company mailbox a paper note claiming to be a 'N***** Tag – Federal Nigger Hunting License,' declaring that the holder was 'licensed to hunt & kill N****** during the open search hereof in the U.S.'" 791 F.3d at 490. The note depicted "a person hanging from a pole or a tree . . . along with the words 'this is for you.'" *Id.* at 491. Months later, the plaintiff received a second nearly identical racist death threat." *Id.* at 492. Other African American employees also received racist death threats. *Id.*

After the plaintiff told her supervisor about the first note, the employer failed to take any remedial actions to end the harassment. The employer "did not call police," did not refer her complaint to the Employee Service Center ("ESC") to conduct an internal investigation, and did not "inform corporate security of the racist message." *Id.* at 498–99. Instead, the plaintiff herself had to "call the ESC to resurrect the investigation and report the incident to police." *Id.* at 499. In addition, the employer "did not promptly install cameras or other monitoring devices," "did not provide [the plaintiff] with additional security or protective measures," and "did not obtain fingerprints, do other forensics analysis, or interview co-workers." *Id.* The plaintiff's supervisors also were not very cooperative in their initial interaction with the police. *Id.* And they failed to inform the investigating human resources manager about prior instances of racism in the workplace. *Id.* Based on the totality of these facts, the Fourth Circuit concluded a reasonable jury could find the employer's "response was neither prompt nor reasonably calculated to end the harassment." *Id.* at 498.

Unlike *Pryor*, the undisputed facts establish that OAR's response to the anonymous letters was reasonably calculated to end the harassment.[7] To be sure, the harassment in this case,

---

[7] Washington argues that OAR could have taken additional steps to prevent the harassment, such as hiring a full-time security guard or issuing a statement that the person responsible for the letters would be terminated. She also claims that OAR failed to promptly install security cameras or move her work mailbox into a more secure, less accessible location.

like in *Pryor*, is very serious. *See id.* at 496 ("[U]se of [the n-word] is the kind of insult that can create an abusive working environment in an instant and is degrading and humiliating in the extreme.") (internal quotation marks and citations omitted). But unlike *Pryor*, OAR promptly contacted the Charlottesville police and the Commonwealth's Attorney's office on the same day Washington received the first anonymous letter. Dkt. 23-2 ¶¶ 9, 20. It also contacted Louisa County Sheriff's Department two days after Washington received the second anonymous letter. Internally, within about a week of Washington receiving the first letter, OAR contracted an attorney to investigate the matter. *Id.* ¶ 17.

In direct contrast to the employer in *Pryor*, OAR fully cooperated with the FBI investigation. *Id.* ¶ 26; *see, e.g.*, Dkt. 32-9 at 2 (OAR giving its call log to the FBI following Washington's complaint about a "mysterious" phone call). It also installed additional security cameras and moved Washington's work mailbox to a more secure area before she was set to return for in-person work. Dkt. 23-2 ¶ 14; Dkt. 30-6 at 3. And while OAR declined Washington's request to employ a security guard, the Fourth Circuit has explained "an employer's response need not be perfect, or even embody best practices, to be considered reasonably calculated to end harassing conduct." *Pryor*, 791 F.3d at 500.

Furthermore, the undisputed facts show that Washington only received one anonymous racist letter at the office. The second and third letters were discovered near her apartment. Thus,

---

However, instead of focusing on what OAR did not do, the Court "must focus on [OAR's] response to the [letters] to determine whether it was 'reasonably likely to stop the harassment.'" *Abdelnaby v. Durham D & M LLC*, No. cv -14-3905, 2017 WL 3725500, at *3 (D. Md. Aug. 29, 2017) (quoting *Xerxes Corp.*, 639 F.3d at 674). The undisputed facts support that OAR promptly contacted local authorities, hired an attorney to investigate the letters, and fully cooperated with the FBI investigation. Thus, the Court concludes that OAR's response to the letters was prompt and reasonably calculated to end the harassment.

OAR's response to the first letter was effective at preventing Washington from receiving racist letters at the office. *See Xerxes Corp.*, 639 F.3d at 670 (explaining "[a] remedial action that effectively stops the harassment will be deemed adequate as a matter of law"). In sum, a reasonable jury could not find the anonymous letters imputable to OAR. Thus, Washington's hostile work environment claims fail.

### B.  Race, Sex, and Disability Discrimination Claims

Washington also asserts that OAR discriminated against her based on race, sex, color, and disability in violation of Title VII, the ADA, and the VHRA. The *McDonnell Douglas* framework applies to discrimination claims brought under Title VII, the ADA, and the VHRA. *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 892, n.4 (4th Cir. 2020). Thus, to establish a prima facie case of discrimination, Washington "must show that: (1) she is protected; (2) she suffered an adverse action; and (3) there is a causal link between her protected status and the adverse action." *Id.*[8]

The parties dispute whether Washington suffered an adverse employment action to establish a race, sex, color, or disability discrimination claim. An adverse action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

---

[8] Specifically, the elements of a prima facie case of discrimination under Title VII and the VHRA are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom.*, 566 U.S. 30 (2012); *see Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). Similarly, to establish a claim for disability discrimination under the ADA, the plaintiff must prove "'(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" *Jacobs v. N.C. Admin. Off. of the Cts.,* 780 F.3d 562, 572 (4th Cir. 2015) (quoting *EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 377 (4th Cir. 2000)).

14

benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). An "adverse action must result in 'some significant detrimental effect,' requiring more than a position that is 'less appealing' to the plaintiff." *Laird*, 978 F.3d at 892 (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)).

Washington argues that the record reflects a genuine dispute of material fact regarding whether she has suffered an adverse employment action. Specifically, she argues that a reasonable jury could find she suffered an adverse employment action when: (1) OAR placed her on a performance improvement plan; (2) OAR requested she work in the office; (3) she purportedly received a "mysterious call" from OAR and found a broken mug in her office; and (4) OAR issued a written warning against her for failing to conduct an in-person jail visit. Dkt. 30 at 19–20.

However, none of these facts establish she has suffered an adverse employment action. Being placed on a performance improvement plan does not amount to an adverse employment action unless it is connected to receiving lower pay, being demoted, being passed over for a promotion, failing to receive a bonus, or being given significantly different responsibilities. *Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (unpublished). Here, Washington was placed on a performance improvement plan for failing to fulfill tasks required by her job duties but after she completed assigned tasks, she was taken off the plan. Dkt. 23-1 at 20–21; Dkt. 23-2 ¶ 36. The record does not show that Washington experienced any negative employment consequence as a result of being placed on the plan.

Contrary to Washington's claim, the record shows that OAR has been accommodating to Washington's requests to work remotely by allowing her to work remote after 12:30pm on Mondays, Tuesdays, Thursdays, and Fridays and after 9:15am on Wednesdays. Dkt. 32-3 at 3. In

addition, the record contains no evidence to suggest that OAR's denial of her request to work fully remote altered the terms, conditions, or benefits of her employment. *See, e.g.*, *Dailey v. Lew*, No. cv-15-2527, 2016 WL 1558150, at *6 (D. Md. Apr. 18, 2016), *aff'd*, 670 F. App'x 142 (4th Cir. 2016) (finding the plaintiff failed to state a retaliation claim, in part, because she had not alleged that the employer's "suspension of her telework arrangement and denials of her subsequent requests for reinstatement altered her salary, the number of hours she is required to work, or her position or responsibilities"). Lastly, Washington receiving a "mysterious call" and a broken mug—both of which were investigated by OAR—and OAR issuing her a written warning did not alter the terms, conditions, or benefits of her employment. *See Burlington Indus., Inc.*, 524 U.S. at 761.

Furthermore, the undisputed facts show that OAR has not demoted or fired Washington or significantly reduced her pay or benefits since she received the first anonymous letter. Dkt. 23-1 at 19 (Washington stating during her deposition that she has received raises and bonuses and that her pay has not been reduced in any way since receiving the first letter).[9] Accordingly, Washington's discrimination claims fail at the first step of the *McDonnell Douglas* framework—establishing a prima facie case.

---

[9] In her opposition brief, Washington claims that she has exhausted her sick leave for medical and wellness appointments since receiving the three letters at issue, and consequently, "her pay has been reduced." Dkt. 30 at 3. According to the record, in July 2022, Executive Director, Carew, sent an email to Washington explaining that her request to take off work on Friday for a therapy session in-person would "further dock [her] pay for [that] pay cycle" since she was "at a negative balance of leave." Dkt. 30-2 at 1–2. While the record reflects that her pay would be reduced if she took off work on that Friday, there is no evidence to suggest this would have significantly reduced her pay or that the reduction would have been taken because of her protected status. *See Burlington Indus., Inc.*, 524 U.S. at 761 (explaining an adverse action is a "a significant change in employment status"). Moreover, in Washington's deposition, she confirmed that her pay had not been reduced in any way since receiving the first letter. Dkt. 23-1 at 19. Thus, evidence showing that Washington's pay might have had been reduced for a pay cycle is insufficient for a reasonable jury to conclude that Washington suffered an adverse employment action.

**C. Retaliation Claim under Virginia's Fraud and Abuse Whistle Blower Protection Act**

Washington claims that OAR violated Virginia's Fraud and Abuse Whistle Blower

Protection Act. The Act provides that:

> No employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower, in whole or in part, because the whistle blower is requested or subpoenaed by an appropriate authority to participate in an investigation, hearing, or inquiry by an appropriate authority or in a court action.

Va. Code. § 2.2-3011(B). Courts "routinely apply [the *McDonnel Douglas*] framework in

adjudicating claims brought under similar state and federal whistleblower statutes." *Carmack v.*

*Virginia*, No. 1:18-cv-31, 2019 WL 4120410, at *15 (W.D. Va. Aug. 29, 2019), *aff'd*, 837 F.

App'x 178 (4th Cir. 2020) (holding the district court committed no fundamental error when it

applied the *McDonnel Douglas* framework to the Virginia whistle blower statute). To survive

summary judgment on this claim, Washington must establish a prima facie case of employment

discrimination or retaliation. *See Guessous*, 828 F.3d at 216 (explaining the *McDonnell Douglas*

framework).

For similar reasons as to those discussed in Section B, the Court cannot discern any

evidence in the record to support that OAR discharged, threatened, discriminated, or retaliated

against Washington for participating in the FBI investigation. Indeed, the undisputed facts show

that OAR has not demoted or fired Washington or significantly reduced her pay or benefits since

she began participating in the FBI investigation. The record also supports that OAR has

cooperated with the FBI investigation. Accordingly, even in viewing the evidence in the light

most favorable to Washington, a reasonable jury could not conclude that OAR retaliated against

Washington for being a purported whistle blower. Va. Code § 2.2-3011(B).

**D. Retaliation Claims under Title VII and VHRA**

Washington asserts unlawful retaliation claims under Title VII and the VHRA against

17

OAR.[10] To establish a prima facie case of retaliation, Washington must show (1) she engaged in

protected activity; (2) she suffered an adverse employment action by OAR; and (3) OAR took

the adverse action because of the protected activity. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333

F.3d 536, 543 (4th Cir. 2003); *see Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir.

2015).

The parties dispute the last element—whether Washington has shown that a reasonable

jury could find that OAR took an adverse action because of her protected activity. To satisfy the

causation element, a plaintiff may establish the existence of facts that suggest "the adverse action

occurred because of the protected activity" or that "the adverse act bears sufficient temporal

proximity to the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th

Cir. 2021) (internal quotation marks omitted) (cleaned up). "The existence of relevant facts

alone, or together with temporal proximity, may be used to establish a causal connection between

the protected activity and the adverse action." *Id.*

Washington claims that she engaged in protected activity in June 2020 when she

complained about how OAR has never promoted a Black woman, in July 2020 and October 2020

when she reported the letters at issue to law enforcement and OAR management, and in

December 2020 and February 2022 when she filed charges of discrimination. Dkt. 30 at 25. She

further contends that OAR retaliated against her purported protected activity by: (1) requesting

---

[10] Title VII's anti-retaliation provision serves to "'prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)) (alterations in original); *see also* Va. Code § 2.2–3901 (noting that "[c]onduct that violates any . . . federal statute or regulation governing discrimination on the basis of race, color, religion, sex . . . including . . . disability . . . is an unlawful discriminatory practice" under the VHRA).

she work in the office in August 2021 without implementing a safety plan; (2) placing her on a performance improvement plan in June 2022; and (3) issuing her a written warning in June 2022.[11] *Id.* at 25–26.

Washington's causation arguments, however, are undermined by the lapse in time between her purported protected activity and OAR's alleged adverse actions. "[A] causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Roberts*, 998 F.3d at 126 (internal quotation marks omitted). While there is no "bright-line rule" for temporal proximity, the Fourth Circuit "has held that a lapse of *three to four months* between the employer's knowledge of protected activity and the alleged retaliation 'is too long to establish a causal connection by temporary proximity alone.'" *Id.* at 127 (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006)) (emphasis added).

About a four-to-twelve-month period exists between Washington purported protected activity and OAR's alleged adverse actions. OAR requesting Washington to work some in the office in August 2021 occurred about a year after Washington voiced her concerns about OAR not promoting a Black woman and reporting the anonymous letters to the authorities and OAR. In addition, OAR's denial of Washington's request to work fully remote occurred approximately eight months after Washington filed her first charge of discrimination in December 2020. And Washington being placed on a performance improvement plan and receiving a written notice occurred four months after she filed her second charge of discrimination in February 2022. Moreover, the record contains no evidence for a reasonable jury to conclude OAR retaliated because Washington engaged in protected activity. Accordingly, even in viewing the evidence in

---

[11] The Court does not consider the three anonymous letters to be an adverse employment action taken by OAR, as argued by Washington, because those letters are not imputable to OAR.

the light most favorable to Washington, the Court concludes that no reasonable jury could find a causal link between Washington's purported protected activity and the alleged retaliatory actions. Thus, her retaliation claims fail.

### E. Failure to Accommodate Claims

Lastly, Washington alleges that OAR failed to accommodate her disabilities of sleep deprivation, PTSD, reactive depression, and anxiety, in violation of the ADA and the VHRA.[12] To establish a prima facie case for failure to accommodate, Washington must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks omitted) (cleaned up). OAR claims that it did not refuse to accommodate Washington's disabilities. The Court agrees.

The record shows that OAR provided Washington several accommodations. Washington worked remotely for approximately a year following the first anonymous letter, and during that time, she delegated some of [r]er work tasks to co-workers. In August 2020, OAR granted Washington's request for two weeks of paid leave to allow her time to relax and repair after receiving the anonymous racist letters. Dkt. 23-7 at 2. In response to Washington's primary care

---

[12] The ADA prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . ." 42 U.S.C. § 12112(b)(5)(A). Similarly, the VHRA prohibits employers from "[r]efus[ing] to make reasonable accommodation to the known physical and mental impairments of an otherwise qualified person with a disability, if necessary to assist such person in performing a particular job . . ." Va. Code § 2.2-3905.1. Because they are "substantively identical statutes," the Court analyzes the ADA and VHRA discrimination claims together. *See Flippo v. Am. Home Prod. Corp.*, 59 F. Supp. 2d 572, 578 (E.D. Va. 1999).

physician and therapist recommending a workplace adjustment, OAR allowed Washington to work only four days per week from May 2021 to July 2022, despite her position requiring five days of work per week. Dkt. 23-2 ¶¶ 28–29; Dkt. 30-11 at 1–3. Lastly, OAR partially accommodated Washington's request for remote work by allowing her to work remote after 12:30pm on Mondays, Tuesdays, Thursdays, and Fridays and after 9:15am on Wednesdays. Dkt. 32-3 at 3.

Despite these accommodations, Washington claims that OAR failed to accommodate her disabilities because it denied her requests to work fully remote, to hire a security guard, and to assign her a parking space in view of the functioning cameras.[13] Dkt. 30 at 32–33. But the Fourth Circuit has explained that "an employer is not required to provide 'the exact accommodation that the employee requested,' and in the alternative may provide 'an alternate reasonable accommodation' at its discretion." *Smith v. CSRA*, 12 F.4th 396, 414 (4th Cir. 2021) (quoting *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 415 (4th Cir. 2015)).

In addition, none of Washington's medical providers have recommended that OAR allow her to work *fully* remote, hire a security guard, or assign her a parking spot to accommodate her disabilities. Instead, since 2021, Washington's primary care physician and therapist have recommended that OAR implement a flexible work schedule for Washington, which OAR has granted, and implement a security plan for her before she returns to work, which OAR granted in part by installing additional security cameras and moving her mailbox to limit general access to it. *See* Dkt. 23-2 ¶ 14, Dkt. 32-3 at 3; Dkt. 30-6 at 3. Accordingly, OAR "was not required to

---

[13] OAR contends that Washington already has access to a parking spot in view of the functioning cameras. Specifically, the OAR Executive Director, Carew, submitted a declaration, explaining that the parking lot outside of the OAR office has 73 marked and designed spots and that the surveillance cameras capture 54 of those spots. Dkt. 32-10 ¶ 5. He further asserts that when Washington arrives for work, "she typically is one of the first employees to arrive and she has her choice of spots." *Id.*

offer [Washington] a remote work accommodation," hire a security guard, or designate her a parking spot, and "its failure to do so was not a refusal to accommodate." *Smith*, 12 F.4th at 415. Accordingly, the Court concludes as a matter of law that OAR did not refuse to provide Washington a reasonable accommodation for her disabilities.

<u>**Conclusion**</u>

For the above reasons, the Court will grant OAR's motion. An accompanying order will be issued.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this <u>15th</u> day of June, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE